No. 97-110

IN THE SUPREME COURT OF THE STATE OF MONTANA

1997


CHOTEAU LIBRARY BOARD OF TRUSTEES,
FAIRFIELD LIBRARY BOARD OF TRUSTEES,
and DUTTON LIBRARY BOARD OF TRUSTEES,

Petitioners and Appellants,

v.

TETON COUNTY BOARD OF COMMISSIONERS,

Respondent and Respondent.


APPEAL FROM:   District Court of the Ninth Judicial District,
In and for the County of Teton,
The Honorable Marc G. Buyske, Judge presiding.

COUNSEL OF RECORD:

For Appellants:
Kenneth R. Olson, Great Falls, Montana

For Respondent:
Russell R. Andrews, Teton County Attorney, Choteau, Montana


Submitted on Briefs: May 22, 1997

Decided:   June 5, 1997

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.


The Choteau, Fairfield and Dutton Library Boards of Trustees (the Boards) have appealed the Ninth Judicial District Court's December 19, 1996 Order denying their petition for declaratory relief and mandamus. The Boards raise two issues on appeal:

1. Did the District Court err in denying the Boards' petition for declaratory judgment?

2. Did the District Court err in refusing to issue a writ of mandamus requiring the Teton County Board of County Commissioners (the Commissioners) to fund the libraries in Teton County as required by 7-6-2348, MCA, and Montana Attorney General Opinions Volume 41, No. 91 (1986) and Volume 44, No. 35 (1992)?

We affirm as to the first issue, and, therefore, do not address the second issue.

BACKGROUND

The Boards filed their petition for declaratory judgment, for writ of mandamus, for order to show cause and for preliminary injunction in June 1996, seeking court intervention to require the Commissioners to maintain funding for the libraries in the communities of , Choteau, Fairfield and Dutton (the Communities). This followed the Commissioners' announcement in the fall of 1995, that county funding for the libraries would cease as of the 1996-97 budget year because the Commissioners deemed the libraries to have no legal existence. Ultimately, this matter was submitted to the District Court for decision on the basis of evidence presented at the hearing for preliminary injunction and on the basis of the affidavits and briefs of the parties. The District Judge denied the relief requested by the Boards and this appeal followed. Because we agreed to decide this case on an expedited basis, we issued an order affirming the trial court on May 22, 1997, indicating that our opinion would follow. The following sets out the rationale for our decision.

The history of how the libraries came into and maintained their existence dictates our decision in this case. Prior to 1968, the Communities each maintained libraries which had been developed through the efforts of local women's clubs, charitable organizations, interested citizens and donations. In the summer of 1968, the Great Falls Library approached the Commissioners and the Communities with a proposal for expanding Community library services through the Great Falls Library under the auspices of the Pathfinder Library Federation. The Communities and the Commissioners responded by each separately contracting with the Great Falls Library under arrangements whereby the Communities each agreed to provide the buildings and utilities and to

appoint
library trustees and the Commissioners agreed to levy one mill and pay that money to the
Great Falls Library. The Commissioners appointed a person to the Pathfinder Federation
Board of Trustees, and it appears that at least one of the libraries has remained a member
of that organization.

Importantly, however, a "Teton County Library," as a legal entity, was not created in 1968, nor did the Commissioners appoint a board of county library trustees, although in the previous year, 1967, the Legislature had enacted a statutory scheme providing for the creation, maintenance and operation of public libraries in counties and cities and for the appointment of trustees. See 1967 Mont. Laws 260 (codified at 44-218 to -228, RCM (1947); current version at 22-1-301 to -314, MCA). Moreover, the record reflects that Teton County and the Communities have never entered into contracts for joint library services as authorized under legislation enacted in 1973. See 1973 Mont. Laws 273 (codified at 44-219.1 and 44-219.2, RCM (1947); current version at 22-1-316 and 22-1-317, MCA).

In 1979, the County began paying the wages of the individual Community librarians who had formerly been paid by the Great Falls Library. Nonetheless, in each year from 1968 until 1990, the Commissioners approved and signed a contract with the Great Falls Public Library for library services in the County. The Boards were each appointed by the respective mayors and city councils of the Communities and the Boards hired the librarians; that continues to the present. In 1990, the Commissioners terminated the County's contract with the Great Falls Library but continued to levy taxes, and, from time to time, contributed revenue sharing funds to support the libraries. The library facilities are and have been since the 1970's owned by the respective individual Communities.

DISCUSSION

The Boards contend that the facts are not in controversy, but, rather, that the issues involve questions of law. We agree, and, accordingly, review the legal conclusions reached by the District Court, de novo, to determine whether the trial judge's interpretation of the law is correct. Carbon County v. Union Reserve Coal Co. (1995), 271 Mont. 459, 469, 898 P.2d 680, 686.

The Boards requested that the District Court declare the existing libraries to be legally constituted on either of two grounds: 1) the libraries exist as de facto public corporations or 2) the Commissioners should be estopped as a matter of public policy from challenging the existence of the libraries as county libraries. In support of

both approaches, the Boards rely on our decisions in Hammermeister v. Northern Mont. Joint Refuse Disposal Dist. (1996), 278 Mont. 464, 925 P.2d 859; and Henderson v. School Dist. No. 44 (1926), 75 Mont. 154, 242 P. 979. We conclude that the Boards' reliance on these cases is misplaced, however.

In Hammermeister, the boards of county commissioners adopted a resolution of intention to create a multi-county joint refuse disposal district. The resolution of intention described a land area larger than the district which was finally created because one of the participant counties ultimately did not pass a resolution to create the district. While notice of the original resolution of intention was properly given according to the governing statutes, no additional notice was given affirmatively apprising affected persons of the reduction in size of the district. Following its creation, the district developed a roll-off site and a landfill site, incurred bonded indebtedness, assessed and collected taxes for services from district residents and was utilized by citizens of the district and other entities on a contract basis. Some five years after its creation, certain disaffected residents of the district challenged its creation contending that the county commissioners did not create the district in accordance with the resolution of intention because the boundaries of the district were reduced from those set forth in the original notice. Hammermeister, 925 P.2d at 860. Citing Henderson, we affirmed the trial court's conclusion that, given the public's reliance on the district for five years, the Hammermeister plaintiffs were estopped from challenging the creation of the refuse disposal district. Hammermeister, 925 P.2d at 862.

In both Henderson and Hammermeister, we stated that since there had been a good faith attempt to comply with the existing laws at issue (Henderson involved the annexation of a small school district to a larger school district), it could be found that the respective districts were de facto corporations, and, thus, not subject to collateral attack. Henderson, 242 P. at 981; Hammermeister, 925 P.2d at 863. Notwithstanding, rather than grounding our decisions in the de facto corporation theory, in each case we held that estoppel based on public policy grounds prevented challenge to the existence of the districts in question. We concluded that declaring the districts at issue void after years of operation would throw public and private rights into considerable confusion and would impair the security of taxes levied, bonds issued and contracts entered into by the districts. Henderson, 242 P. at 981-82; Hammermeister, 925 P.2d at 863.

As previously noted, the Boards requested that the District Court declare the

existing libraries to be legally constituted on either of two grounds: 1) the libraries exist as de facto public corporations or 2) the Commissioners should be estopped as a matter of public policy from challenging the existence of the libraries as county libraries. We address each ground separately.

First, the Boards contend that the Commissioners established a free public library under the library laws of the State of Montana in 1968, citing    44-211 to -215, -218 to -228, RCM (1947), and the agreement between Teton County and the Great Falls Library signed that year and renewed  each year until 1990.  The Boards concede, however, that the statutes were not precisely followed.

In both Henderson and Hammermeister, while not grounding our decisions on the de facto corporation theory, we did state that applicability of this doctrine was premised on an initial good faith attempt to comply with the governing statutory scheme.  In each case, we concluded that there was a predicate good faith attempt to comply with the existing, applicable law.  Henderson, 242 P. at 981; Hammermeister, 925 P.2d at 863. Thus, in order to determine whether the same predicate good faith attempt existed in the case at bar, it is necessary to examine the governing statutes in effect in 1968.  Section 44-211, RCM (1947) (enacted 1915; Sec. 11, Ch. 45, L. 1915; current version at   22-1-315, MCA), authorized the county commissioners to enter into a terminable contract with the board of trustees or governing authority of a free public library in another incorporated city or town for the purpose of having this other library assume the functions of a free public library in the county instead of establishing a separate county free library.  The county commissioners were also authorized to fund this contract from the county free library fund under this section.

Two other statutory schemes relating to libraries were in existence  in 1968. Sections 44-212 to -215, RCM (1947), provided for library systems including library federations or library networks.  These statutes were originally enacted in 1939, and are collectively referred to hereafter as the "library system statutes."  See 1939 Mont. Laws 132.  The remnants of these statutes are now  included in Title 22, Chapter 1, part 4 of the Montana Code.

As pointed out above, the 1967 Legislature also enacted   44-218 to -228, RCM (1947), which set up a statutory scheme by which counties and cities could establish public libraries within their respective jurisdictions by resolution, by petition or by petition and election.  These statutes provided for the appointment of a library board and

for levying of taxes by the governing body and addressed other matters regarding the operations of the libraries and boards so created.  These statutes are now codified (with subsequent amendments) at    22-1-301 to -314, MCA, and are collectively referred to hereafter as the "public library statutes."

While the Boards cite to    44-211, RCM (1947), and to the library system statutes in both their petition and in their briefs before the trial court and on appeal, it is clear that their argument is actually premised on the Commissioners' alleged attempt to comply with the then newly enacted public library statutes  in conjunction with the County's execution of the 1968 Great Falls Library contract as the basis for their contention that the libraries were created as free public libraries in that year and were maintained as such thereafter.  The fallacy of this argument, however, is that the record simply does not support a conclusion that what the Commissioners were attempting to do in 1968 was to comply with the public library statutory scheme.  At a minimum, these statutes required that the Commissioners pass and enter upon the minutes a resolution to the effect that a free public library was established,  44-219(1), RCM (1947) (enacted 1967; current version at   22-1-303(1), MCA), and then that they appoint a five person board of trustees to govern the operations of the county library so created,  44-221, RCM (1947) (enacted 1967; current version at   22-1-308, MCA).

In the instant case, what the Commissioners actually did in 1968 was to meet with the Librarian for the Great Falls Library with a view to contracting for bookmobile, workshop and training services for the Community librarians to be provided by the Great Falls Library under auspices of the Pathfinder Library Federation.  These meetings culminated in the passage of a motion by the Commissioners authorizing the County to enter into an Agreement for Library Services with the Board of Trustees of the Great Falls Public Library dated September 5, 1968, to the end that the Great Falls Public Library would "furnish library service also to the people of Teton County."  While this agreement (and subsequent renewal agreements) detailed various services that the Great Falls Library was obligated to furnish to the people of Teton County and to the individual Community libraries for a sum certain which the County agreed to pay, there is no indication whatsoever in either the minutes of the Commissioners' meetings or in the initial or renewal agreements that the Commissioners were actually attempting to create a county library under the public library statutes then in effect or as subsequently amended.

The Commissioners never adopted a resolution to that effect as required by 44-219(1), RCM (1947) (enacted 1967; current version at   22-1-303(1), MCA), nor did

they ever appoint a five person county board of library trustees as required by 44-221, RCM (1947) (enacted 1967; current version at 22-1-308, MCA). Moreover, as mentioned above, each of the Community city councils entered into separate agreements with the Great Falls Library Board obligating their respective cities to provide quarters and utilities for their local library and to appoint a board of trustees in exchange for various delineated services to be provided by the Great Falls Library.

While the record does support a conclusion that the Commissioners intended to assist the Community libraries with funding for the provision of federation library services pursuant to 44-211, RCM (1947), and/or pursuant to the library system statutes then in effect, there is no persuasive evidence in the record that the Commissioners intended to actually create a county library under the public library statutes. Indeed, the County's contract with the Great Falls Library for the provision of library services, with the County providing funding from tax levies and appointing a trustee to the advisory Pathfinder Federation Board and with the local Community library boards appointed by the city councils retaining autonomy, budgetary and administrative control over their respective libraries fits neatly within the library system statutory scheme but not at all within the public library statutory scheme. Furthermore, there is nothing in the library system statutes that would lead to the conclusion that local governments utilizing that statutory scheme would, in so doing, thereby create a new county (or city) library as a legal entity where none existed before. In fact, if, as is stated in the 1968 contracts between the individual Communities and the Great Falls Public Library, 44-211, RCM (1947), was the statutory basis for the Commissioners' actions, this section unequivocally provides authority for the county to contract for library services "[i]nstead of establishing a separate county free library." Section 44-211, RCM (1947) (emphasis added).

In short, we conclude that there was no attempt--good faith or otherwise--by the Commissioners to create a county library by complying with the public library statutes enacted in 1967, nor was there even an intent on the Commissioners' part to utilize this statutory scheme for that purpose. Accordingly, the Boards' argument that the existing libraries meet the requirements for creation of a de facto public corporation under either Henderson or Hammermeister must fail.

We turn, then to the Boards' argument that, for public policy reasons, the Commissioners are estopped from denying the existence of a county library under the public library statutes. Again, the Boards rely on our decisions in Henderson and in Hammermeister. In the latter case, we cited with approval the following language

from
the former:

> After a community has for years, as in the case at bar, exercised the functions of a public corporation, its legal existence cannot be questioned without causing disturbance more or less serious, and if the question of the regularity of its organization can be kept open to collateral inquiry indefinitely, no one can ever be secure in dealing with such entities, or be sure that taxes levied, bonds floated, or contracts necessarily entered into for the transaction of its business will be valid and enforceable. The transaction of public business might be locked at any time at the will or whim of a private individual and the credit of the corporation impaired or destroyed. For these and other cogent reasons it is held that:
>
> "An individual may be estopped by his conduct to attack the validity of the incorporation of a municipality, even though, but for such estoppel, he might do so." 28 Cyc. 175.
>
> Thus acquiescence in the exercise of corporate functions, and dealing with the corporation as such over a period of years will estop all persons dealing with the corporation from assailing its legality. [Citations omitted.]

Hammermeister, 925 P.2d at 862 (quoting Henderson, 242 P. at 981-82) (alteration in original).

We also pointed out:

> [T]he estoppel here invoked is not, therefore, strictly an estoppel by acceptance of benefits, but rather it is an estoppel based upon public policy, because of the confusion into which a judgment, at this late date, that the organization was void, would throw public and private rights and interests acquired through years of operation with the acquiescence of the inhabitants, and is therefore not dependent upon knowledge of the facts.

Hammermeister, 925 P.2d at 862-63 (quoting Henderson, 242 P. at 982) (alteration in original). Accord Scilley v. Red Lodge-Rosebud Irr. Dist. (1928), 83 Mont. 282, 272 P. 543 (cited in Hammermeister, 925 P.2d at 863).

Again, the inapplicability of this public policy estoppel theory is apparent from the facts of the case before us. While for a number of years the Commissioners funded library services to Teton County and assisted the Community libraries--for the most part via contract with the Great Falls Library--there never was created any sort of "county library" that exercised the functions of a public corporation or which had or which purported to have a legal existence independent of the County itself. No such professed organization or entity floated bonds, levied taxes, entered into contracts, purchased or owned property or transacted public business. Indeed, each of the Communities owned and maintained its own library facilities, appointed its own autonomous board of trustees, ran its own operations, transacted its own business and hired its own librarian. While the County provided the funding for these operations via a tax levy, and, from time to time, by providing revenue sharing, that, in an of itself, is a wholly insufficient

basis on
which to judicially estop the Commissioners from denying the existence of an alleged separate public corporation or legal entity with which no one dealt as such.  The public policy reasons for application of the estoppel theory utilized in both Henderson and Hammermeister are absent in the case before us on appeal.  In fact, it would be a dangerous, if not unlawful, precedent to effectively hold that a governing body could, by the passage of enough time, lose its ability to discontinue what was otherwise a discretionary tax levy, simply because the public had become accustomed to the non-mandated services that the tax levy funded.  To apply the public policy estoppel theory in this case would be to create a county library from whole cloth.  Estopping the Commissioners from denying the existence of an entity that, but for some technical irregularity in its formation,  apparently exists as a separate legal organization and transacts business as such is one thing; using this theory to create the organization in the first instance is quite another.  We hold that the public policy estoppel theory is not applicable in this case to preclude the Commissioners from denying the legal existence of the Community libraries as a county free public library.

We close with a final observation.  Certainly no one can take  comfort  in witnessing the death of a public library, whether small or large.  As members of a learned profession dependent upon the wisdom, the precedents and the laws reported in books maintained with care in libraries, we take no joy in rendering this decision.  We acknowledge that, for many of our citizens, the library is their only source of news, information, knowledge, entertainment and social contact.  Great civilizations have given birth to great libraries, and it may be said that, by no historical accident, the demise of libraries has preceded the decline of knowledge and literacy and has presaged the collapse of societies themselves.

The citizens of Teton County are not without a remedy, however.  Title 22, Chapter 1, part 3 of the Montana Code specifies the manner in which a public library may be legally established and maintained in any county or city of this State.  The citizens of Teton County and of each of the Communities may yet save their libraries by petition or by petition and election.  Sections 22-1-303(2) and (3), MCA.  While the courts may be powerless to save the libraries of Choteau, Fairfield and Dutton, the residents themselves of these communities are not.  As the District Judge wisely noted in his decision,  the court of public opinion may yet prevail.

Affirmed.

/S/  JAMES C. NELSON


We Concur:

/S/  W. WILLIAM LEAPHART

```
            /S/   JIM REGNIER
     /S/   TERRY N. TRIEWEILER
     /S/   WILLIAM E. HUNT, SR.
```